1   ALAN J. LAZARUS (SBN #129767)
    alan.lazarus@dbr.com
2   RODNEY M. HUDSON (SBN #189363)
    rodney.hudson@dbr.com
3   DRINKER BIDDLE & REATH LLP
    50 Fremont Street, 20th Floor
4   San Francisco, CA  94105-2235
    Telephone:    (415) 591-7500
5   Facsimile:    (415) 591-7510

6   Attorneys for Defendants
    MATRIXX INITIATIVES, INC. and ZICAM LLC
7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11

12   MICHAEL D. NELSON,                    Case No. CV 09 2904 WHA

13              Plaintiff,                 **DEFENDANTS' MOTION TO EXCLUDE
                                           CERTAIN TESTIMONY OF GREG DAVIS,**
14        v.                               **M.D.**

15   MATRIXX INITIATIVES, INC., a
     Delaware corporation; ZICAM LLC, an   Hearing Date: August 9, 2012
16   Arizona limited liability company; and Time:         8:00 a.m.
     DOES 1 through 25,                     Judge:        William H. Alsup
17                                          Courtroom:    8, 19th Floor
                Defendants.
18                                          [Oral Argument requested]

19

20

21

22

23

24

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1                                              CASE NO. CV 09 2904 WHA

1

## TABLE OF CONTENTS

2   NOTICE OF MOTION ................................................................................................ 1

3   MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

4   I. BACKGROUND .................................................................................................... 1

5       A.    The Product ........................................................................................... 1

6       B.    Smell Disorders .................................................................................... 2

7       C.    Nasal Stinging and Burning Complaints ............................................ 3

8       D.    The Smell Loss Hypothesis And Investigation ................................... 4

9       E.    History of Zicam Litigation and Prior Applications of Rule 702 ............. 6

10      F.    The MDL General Causation Daubert Motions ................................. 8

11      G.    Withdrawal of the Product in June 2009 ............................................ 9

12      H.    Specific Causation Testimony ........................................................... 10

13          1.    Plaintiff's Medical History ....................................................... 10

14          2.    Initial Medical Treatment ......................................................... 11

15          3.    Post-Suit Medical Consultation ............................................... 12

16          4.    Dr. Davis' Causation Opinions ............................................... 13

17  II. DISCUSSION .................................................................................................... 15

18      A.    Statement of the Law ......................................................................... 15

19      B.    Dr. Davis' Causation Opinion Is Speculative And Lacks Reliable Basis
20          And Fit Due To The Existence Of Analytical Gaps ............................... 17

    C.    Dr. Davis' Causation Opinion Is Based On A Speculative And Unreliable
21          Differential Etiology .......................................................................... 20

22  III. CONCLUSION ................................................................................................. 25

23

24

25

26

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1

CASE NO. CV 09 2904 WHA

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Abuan v. General Elec. Co,*
   3 F.3d 329 (9th Cir. 1993) ................................................................................................. 18

5

6

*Allen v. Pennsylvania Engineering Co.,*
   102 F.3d 194 (5th Cir. 1996) ....................................................................................... 18, 19

7

8

*Allison v. McGhan Med. Corp.,*
   184 F.3d 1300 (11th Cir. 1999) ....................................................................................... 17

9

*Benkwith v. Matrixx Initiatives, Inc.,*
   467 F. Supp. 2d 1316 (M.D. Ala. 2006) .......................................................................... 7, 8

10

11

*Bland v. Verizon,*
   538 F.3d 893 (8th Cir. 2008) ........................................................................................... 19

12

*Cacciola v. Selco Balers, Inc.,*
   127 F.Supp.2d 175 (E.D.N.Y. 2001) ............................................................................... 16

13

14

*Cagle v. Cooper Indus., Inc.,*
   318 F.Supp.2d 879 (C.D. Cal. 2004) ............................................................................... 17

15

16

*Claar v. Burlington Northern R. Co.,*
   29 F.3d 499 (9th Cir. 1994) ............................................................................................. 16

17

*Clausen v. M/V New Carissa,*
   339 F.3d 1049 (9th Cir. 2003) ....................................................................... 19, 20, 21, 24

18

19

*Cooper v. Brown,*
   510 F.3d 870 (9th Cir. 2007) ........................................................................................... 16

20

21

*Daubert v. Merrell Dow Pharms.,*
   43 F.3d 1311 (9th Cir. 1995) ......................................................................... 16, 21, 23, 24

22

*Daubert v. Merrill Dow Pharms.,*
   509 U.S. 579 (1993) ..................................................................................... 15, 16, 17

23

24

*E. I. duPont de Nemours & Co. v. Robinson,*
   923 S.W.2d 549 (Tex. 1995) ............................................................................................ 22

25

*Evans v. Matrixx Initiatives, Inc.,*
   2009 U.S. Dist. LEXIS 88224 (M.D. Fla. Feb. 18, 2009) ............................................... 8

26

27

*General Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ......................................................................................................... 17

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS     - ii -     CASE NO. CV 09 2904 WHA
SF01/ 841794.1

*Hans v. Matrixx Initiatives, Inc.,*
   2006 U.S. Dist. LEXIS 96779 (W.D. Ky. Sept. 29, 2006) ...................................... 7

*Hilton v. Matrixx Initiatives, Inc.,*
   2007 U.S. Dist. LEXIS 73264 (N.D. Tex. Feb. 20, 2007) .................................... 7

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) .................................................................................. 16

*Lusch v. Matrixx Initiatives, Inc.,*
   2007 U.S. Dist. LEXIS 72068 (D. Or. Sept. 25, 2007) .................................... 7, 8

*McClain v. Metabolife Int'l, Inc.,*
   401 F.3d 1233 (11th Cir. 2005) .......................................................... *passim*

*O'Hanlon v. Matrixx Initiatives, Inc.,*
   2007 U.S. Dist. LEXIS 65655 (C.D. Cal. Jan. 4, 2007) .................................... 7, 8

*In re Paoli Railroad Yard PCB Litig.,*
   35 F.3d 717 (3d Cir. 1994) ................................................................ 20, 21, 24

*Polski v. Quigley Co.,*
   538 F.3d 836 (8th Cir. 2008) ............................................................................ 7

*Rose v. Matrixx Initiatives, Inc.,*
   2009 WL 902311 (W.D. Tenn. Mar. 31, 2009) ........................................................ 8

*Ruggiero v. Warner-Lambert,*
   424 F.3d 249 (2d Cir. 2005) ...................................................................... 19

*Salden v. Matrixx Initiatives, Inc.,*
   2007 U.S. Dist. LEXIS 18552 (E.D. Mich. Mar. 16, 2007) .................................... 7

*Sutherland v. Matrixx Initiatives, Inc.,*
   2006 U.S. Dist. LEXIS 96652 (N.D. Ala. Nov. 7, 2006) ............................ 5, 6, 7, 8

*In re Viagra Prods. Liab. Litig.,*
   658 F.Supp.2d 950 (D.Minn. 2009) .......................................................... 21, 22, 24

*Wright v. Willamette Indus. Inc.,*
   91 F.3d 1105,1106 (8th Cir. 1996) .......................................................... 18

*Wyatt v. Matrixx Initiatives, Inc.,*
   2007 U.S. Dist. LEXIS 67986 (N.D. Ala. Mar. 30, 2007) .................................... 7, 8

*In re Zicam Cold Remedy Marketing, Sales Practices, and Prods. Liab. Litig.,*
   2011 WL 798898 (D. Ariz. Feb. 24, 2011) ........................................ 8, 9, 10, 11

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS          - iii -          CASE NO. CV 09 2904 WHA
SF01/ 841794.1

**STATUTES, RULES & REGULATIONS**

Federal Rules of Evidence, Rule 702........................................................................................*passim*

**OTHER AUTHORITIES**

Stedman's Medical Dictionary (26th ed. 1995) ............................................................. 20

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                          - iv -                    CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:** Please take notice that on August 9, 2012 at 8:00 a.m., in Courtroom 8 of the above-entitled courthouse, located at 450 Golden Gate Ave., San Francisco, or as soon thereafter as the matter may be heard, Defendants Matrixx Initiatives, Inc. and Zicam LLC ("Defendants") will move this Court for an Order granting Defendants' Motion To Exclude Certain Testimony Of Greg Davis, M.D.  Defendants' Motion is based on this notice, motion and supporting papers, including points and authorities, declarations, the evidence in support of the motion, and all associated papers, the complete files and records of this action, and such other and further arguments as may be adduced at the hearing.

This Motion seeks the exclusion of testimony by Plaintiff's designated expert witness Dr. Greg Davis that Zicam was the cause of Plaintiff's alleged injuries.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff has designated Dr. Davis to testify as an expert on both general causation (whether ordinary use of Zicam is capable of causing smell loss) and specific causation (whether Zicam as used by Plaintiff caused Plaintiff's smell loss).  Dr. Davis' general causation testimony has already been limited in certain respects by order of the MDL court.  This motion challenges Dr. Davis' opinion that Zicam use, and not other risk factors in Plaintiff's medical history, was the actual cause of Plaintiff's smell loss.

Dr. Davis' testimony lacks both the reliability and fit required by Federal Rule of Evidence 702.  This motion should be granted.

**I.**

**BACKGROUND**

A.    **The Product**

Zicam® Cold Remedy Nasal Gel (Zicam) is a homeopathic cold remedy marketed by Defendants Matrixx Initiatives, Inc. (Matrixx) and Zicam LLC, a viscous gel applied to the nose with either a spray pump or a swab resembling a Q-Tip.  The active ingredient is zinc gluconate. *See* Declaration of Timothy Clarot In Support of Defendants' Motions for Summary Judgment and Motions to Exclude Plaintiff's Experts ("Clarot Dec.") ¶ 12.  Typical of homeopathic

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1

CASE NO. CV 09 2904 WHA

1   remedies, the level of active ingredient is minimal, here just a 1.58% concentration.  Each

2   metered dose of Zicam spray contains 130-140 microliters of gel, approximately 1/35 of a

3   teaspoon.  The total amount of zinc delivered into the nose is .231% of the gel, amounting to

4   about 260-280 micrograms of zinc with each squirt.  *See* Index of Evidence In Support of

5   Defendants Motions for Summary Judgment and Motions to Exclude Plaintiff's Experts ("Index

6   of Evidence"),[1] Exh. 58 (Phillips Rpt.) at 8.

7      Zicam is designed to deliver the gel to the very lowest part of the nose, the nasal vestibule

8   or atrium and, as discussed below, the available scientific evidence demonstrates that under

9   conditions of ordinary use (including reasonable misuse), the gel does not reach the smell tissue

10  located in the olfactory cleft.  Exh. 54 (Dalby Rpt.) at 10-11, 16.

11  **B.      Smell Disorders**

12     Chronic smell impairment, including complete smell loss (anosmia) and partial loss

13  (hyposmia), is a fairly common condition.  It is currently estimated that between 15% and 20% of

14  adults have chronic smell disorders.[2]  It is generally accepted that the most common causes of

15  chronic smell loss are upper respiratory infections (URIs), such as cold and flu, and sino-nasal

16  diseases such as rhinitis and sinusitis, and that a substantial percentage of cases are classified as

17  idiopathic, meaning the cause is unknown to medical science or otherwise undetermined.  Exh. 76

18  (Scheibe 2008).  It is also well-established in the scientific community that the risk of  smell loss

19  increases with age, placing individuals in their mid-to-late 60s like Plaintiff squarely within the

20  high risk group.  Exh. 57 (Kip Rpt.) ¶¶ 39-44; Exh. 67 (Kimmelman Rpt.) at 2.

21     The olfactory nerve receptors which transmit smell signals, the olfactory epithelium

22  (hereafter "OE" or "smell tissue"), are concentrated in a small patch of tissue tucked away in a

23  remote portion of the roof of each nostril near the midline of the eyes, known as the "olfactory

---

25     [1] All record citations will be to Defendants' Index of Evidence.

26     [2] Recent European epidemiological studies using objective diagnostic testing concluded
    that significant smell dysfunction is present in close to 20% of all adults.  *Id* Exh. 57 (Kip Rpt.)
27  ¶ 41; Exh. 72 (Brämerson 2004).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS               - 2 -               CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1    cleft" , which includes the dorsoposterior regions of the adjacent nasal septum and superior

2    turbinate.  Small isolated patches of histological smell tissue can sometimes be found in some

3    individuals in areas adjacent to the olfactory cleft.  Exh. 76 (Scheibe 2008) at 643; Exh. 66

4    (Fedoruk Rpt.) at 9; Exh. 52 (Schwob Rpt.) at 8-9.  The anatomy of the nasal cavity is convoluted

5    and complex and the path from the entrance of the vestibule to the olfactory cleft is circuitous.

6    Exh. 66 (Fedoruk Rpt.) at 10; Exh. 54 (Dalby Rpt.) at 6.  These characteristics, and others, make

7    it highly unlikely that any of the viscous gel reaches the olfactory cleft, particularly when Zicam

8    is used as directed.  *Id.* at 11-12, 15-16.

9    **C.**     **Nasal Stinging and Burning Complaints**

10           Even before Zicam reached the market, it became evident that there would be an ongoing

11   customer satisfaction issue arising from its propensity to irritate the often inflamed tissue in the

12   nasal cavity.  From the first, pre-marketing clinical through the post-marketing clinicals, the most

13   frequent complaint about the product was stinging and burning sensation.  Clarot Dec. ¶ 25;

14   Davidson Dec. ¶¶ 3-5.  Immediately after the product went to market, the company began

15   receiving stinging and burning complaints, and they continued throughout its time on the market.

16   These complaints were usually independent of complaints of smell loss, and smell loss

17   complaints were usually independent of any report of stinging and burning, though some users

18   complained of both stinging and burning and smell loss.  Clarot Dec. ¶ 25; Exh. 67 (Kimmelman

19   Rpt.) at 2-3; Exh. 66 (Fedoruk Rpt.) at 18.

20           Physiologically, sensations of pain or heat are transmitted by trigeminal nerve endings

21   which are located throughout the nasal cavity, and the trigeminal nerves do not receive odorants

22   or transmit smell sensation.  The olfactory nerves (the OE) do not experience pain; they only

23   receive and transmit sensations of odor. Exh. 67 (Kimmelman Rpt.) at 2-3.

24           In short, burning is a common occurrence with introduction of an astringent substance into

25   the nose, particularly during a cold; damage to the OE is an independent unrelated phenomenon

26   and does not suggest in a scientifically reliable manner that damage is occurring to the smell

27   tissue.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                    - 3 -                    CASE NO. CV 09 2904 WHA
SF01/ 841794.1

**D.**     **The Smell Loss Hypothesis And Investigation**

In 2004, in response to the publication of a case report by Dr. Bruce W. Jafek hypothesizing that Zicam can cause smell loss, Matrixx convened a Scientific Advisory Board (SAB) to study the issue and design experiments to test that hypothesis. Clarot Dec. ¶¶ 12-13. Distribution studies were performed to determine whether the Zicam gel can reach the olfactory cleft (the target organ for olfactotoxicity) with the then-existing sprayer[3] when used as directed or flagrantly misused; a mouse study evaluated the dose-response curve for Zicam and compared it to another compound, zinc sulfate; and an epidemiological study investigated the medical conditions and prescription medications associated with chronic smell loss. *Id.* at ¶ 16.

(1) Distribution/Target Organ Exposure:  Dr. Jafek's hypothesis assumed the Zicam gel was deposited in the olfactory cleft.  Accordingly, the SAB designed and had conducted distribution studies investigating where the gel was deposited in the nasal cavity under conditions of proper use (following the directions) and even extraordinary conditions of flagrant misuse (using the product without congestion, intentionally directing the sprayer toward the olfactory cleft, enabling deeper insertion of the sprayer by anesthetizing the nasal cavity, and vigorously sniffing).  In a peer-reviewed and published study, all 39 of the proper use administrations fell far short of the olfactory epithelium, penetrating no deeper in the nasal cavity than the lower part of the middle turbinate and most often not even reaching that far.  All 39 of the extraordinary misuse applications fell well short of the olfactory epithelium, penetrating no deeper in the nasal cavity than the lower part of the middle turbinate but reaching that deep more frequently than with the proper application procedure.[4]  The peer-reviewed and published distribution study found that under conditions of ordinary use, the Zicam gel did not reach the olfactory cleft.[5]

---

[3] From 1999 to 2005, the sprayer actuator (nozzle) had a single central hole.  Beginning in 2005, the actuator had a multi-hole radial design. Clarot Dec.¶ 23. The designs are referred to as single-hole actuator and showerhead, respectively.

[4] With improper use, 27% of the subjects had some trace of dye reach the lower part of the middle turbinate, compared to 19% of the subjects using the sprayer according to directions. Exh. 30 (Herranz 2006) (English and Spanish translation). *See* Exh. 52 (Schwob Rpt.) at 9.

[5] *Id.*  In addition, the SAB conducted two unpublished pilot studies to characterize the

(Continued)

1    (2) Dose-Response/Zinc Sulfate Extrapolation:  Dr. Jafek failed to address the

2    fundamental toxicological question of what dose would be needed to cause smell loss, and he also

3    assumed that the toxicity of zinc sulfate and the toxicity of zinc gluconate were directly

4    comparable, despite their differences in structure, composition, disassociation characteristics, zinc

5    content, and biological effects.  *Sutherland*, 2006 U.S. Dist. LEXIS 96654, at *26; Exh. 58

6    (Phillips Rpt.) at 39; Exh. 52 (Schwob Rpt.) at 14.  Accordingly, the SAB designed and

7    conducted a study which administered high (2 microliters), higher (8 microliters) and

8    extraordinarily high (50 microliters) doses of Zicam to mice to examine the effect on smell tissue

9    and function, and also applied and assessed comparative doses of zinc sulfate.  Mice have a much

10   smaller nasal cavity than humans and a much greater portion of it consists of OE.

11   The peer-reviewed and published study found that the 2 microliter dosed mice (equivalent

12   to at least four times the human dose of Zicam) experienced no damage to any of the OE and no

13   dysfunction; some of the 8 microliter dosed mice (a dose equivalent to about 15 times the human

14   dose of Zicam) had some minor disruption of the OE but no discernible effect on function.  The

15   50 microliter dosed mice (a "lavage" dose, i.e., a dose which completely floods the mouse nasal

16   cavity) (equivalent to approximately 94 times the prescribed human dose of Zicam) consistently

17   experienced significant OE damage and partial disruption of function, equating with hyposmia,

18   but this deficit largely reversed itself within 21 days.  The zinc sulfate solution caused

19   substantially greater damage and dysfunction than Zicam, indicating that the zinc sulfate used in

20   the animal studies had a substantially more aggressive dose-response curve than the zinc

21   _____

22   (Continued)

23   deposition and distribution pattern of Zicam, one on a cadaver and another *in vivo*, and an
     unpublished *in vivo* study at the University of Pittsburgh. Exh. 29  University of Pittsburgh Study
     (2005) (unpublished); Exh. 28 University of Pittsburgh Pilot Study. The unpublished Pittsburgh

24   in vivo study was plagued by a significant breach of protocol (subjects were mistakenly
     administered a topical vasoconstrictor, which caused an unnatural widening of the nasal airway

25   and artificially increased access to the olfactory cleft) and other quality control issues.  None of
     the 25 proper use applications had any of the dyed gel reach the olfactory cleft; insignificant

26   traces of dye reached close to the olfactory cleft in 4 of the 25 of the misuse applications.  Exh. 29
     (Pittsburg Study).  But even these findings were at best equivocal and did not represent any

27   reasonably anticipated real world use of the product. Exh. 52 (Schwob Rpt.) at 9-10.

28

1     gluconate in Zicam.  Exh. 26 (Slotnick 2007) at 745-48; Exh. 58 (Phillips Rpt.) at 32-33; Exh. 52

2     (Schwob Rpt.) at 12-13.

3           (3) Epidemiology:  The epidemiological study confirmed that the most prominent

4     conditions associated with smell loss included URI and rhinitis and sinusitis.  Exh. 77 (Nguyen-

5     Khoa 2007) at 755.

6           The SAB reviewed the available preliminary research from these studies and unanimously

7     concluded in September 2004 that the hypothesis that Zicam causes smell loss was unsupported

8     by the scientific evidence.  Exh. 25 (8K Filed Sept. 29, 2004).  That conclusion was reaffirmed at

9     an SAB meeting in May 2005.  Clarot Dec. ¶¶ 16-17.

10          In August 2010 the company conducted another distribution study, this one involving its

11     more recent sprayer design with the radial actuator, to investigate the distribution pattern of the

12     Zicam gel with this spray design, when sprayed according to the package directions and also

13     under conditions of extraordinary misuse.  The data confirmed that with the "showerhead"

14     sprayer, the gel reaches no further in the nose than the head of the inferior turbinate even with

15     improper use, and does not reach the vicinity of the olfactory cleft.  Exh. 31 (Herranz 2010);

16     Exh. 52 (Schwob Rpt.) at 9; Clarot Dec. ¶ 24.  Discovery has confirmed that the Zicam used by

17     Plaintiff was a showerhead sprayer.  *Id.*  ¶ 25.

18     **E.**    **History of Zicam Litigation and Prior Applications of Rule 702**

19          Eleven District Courts since 2006 have applied Rule 702 to causation opinions based on

20     the scientific evidence of a link between Zicam use and smell loss.  Ten of those courts excluded

21     the causation opinions of various experts in their entirety.  The MDL court excluded various

22     parts, but not all, of the general causation testimony of the experts designated by Plaintiff to

23     testify on causation.

24          The first physician to suggest that ordinary use of intranasal Zicam causes smell loss was

25     ENT Dr. Alan Hirsch who authored a one paragraph case report/poster in 2000.  Dr. Hirsch

26     reported a case and concluded that "ionic zinc instilled directly on the olfactory epithelium

27     appears to be the pathogen in this patient's smell loss" and therefore "further investigation of the

28     olfactory effects of the Zicam inhaler is warranted."  Exh. 79 (DeCook & Hirsch Case Report).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1
- 6 -
CASE NO. CV 09 2904 WHA

1  Inevitably, Dr. Hirsch surfaced as an expert witness on behalf of certain plaintiffs in subsequent

2  Zicam litigation.  In a detailed opinion describing the foundational deficiencies of his opinions,

3  the District Court excluded Dr. Hirsch's testimony.  Exh. 41; *Salden v. Matrixx Initiatives, Inc.,*

4  2007 U.S. Dist. LEXIS 18552, *6-12 (E.D. Mich. Mar. 16, 2007).

5           In September 2003, Dr. Jafek published his poster, later turned into a published case

6  "series" (a case report describing observations of more than one patient) claiming that his clinic

7  had seen ten patients who experienced smell loss after Zicam use and attributing the smell loss to

8  exposure of the OE to intranasal zinc.  Exh. 20 (Jafek 2003 Poster and Jafek Case Series 2004).

9  Discovery and motion practice later revealed substantial irregularities in Dr. Jafek's work,

10  several gaps in his foundation and analysis, and several departures from generally accepted

11  scientific methodology.  Consequently, his expert opinions were excluded by all federal courts to

12  evaluate its admissibility under Rule 702.  *See* Exh. 36-40, 42-43; *Lusch v. Matrixx Initiatives,*

13  *Inc.,* 2007 U.S. Dist. LEXIS 72068 (D. Or. Sept. 25, 2007); *Wyatt v. Matrixx Initiatives, Inc.,*

14  2007 U.S. Dist. LEXIS 67986 (N.D. Ala. Mar. 30, 2007); *Hilton v. Matrixx Initiatives, Inc.,* 2007

15  U.S. Dist. LEXIS 73264 (N.D. Tex. Feb. 20, 2007); *O'Hanlon v. Matrixx Initiatives, Inc.*, 2007

16  U.S. Dist. LEXIS 65655 (C.D. Cal. Jan. 4, 2007); *Benkwith v. Matrixx Initiatives, Inc.,* 467

17  F. Supp. 2d 1316 (M.D. Ala. 2006); *Sutherland v. Matrixx Initiatives, Inc.,* 2006 U.S. Dist.

18  LEXIS 96652 (N.D. Ala. Nov. 7, 2006); *Hans v. Matrixx Initiatives, Inc.,* 2006 U.S. Dist. LEXIS

19  96779, *21-22 (W.D. Ky. Sept. 29, 2006).  *See also Polski v. Quigley Co.*, 538 F.3d 836 (8th Cir.

20  2008) (affirming exclusion of Dr. Jafek's causation opinions as to Cold-Eeze, a competing

21  intranasal zinc gluconate cold remedy).

22           A third physician to appear in Zicam litigation was ENT Dr. Terence Davidson of the

23  University of California at San Diego.  Long after becoming an expert witness, Dr. Davidson

24  published a case series in 2006 purporting to demonstrate that 15 patients in his clinic had

25  experienced smell loss after Zicam use, which he attributed to the drug.  Exh. 80 (Davidson

26  2006).  Dr. Davidson's theories differed from Dr. Jafek's theories in various nuances, but were

27

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                    - 7 -                    CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1    plagued by the same fundamental flaws.[6]  Both courts to address the reliability and admissibility

2    of his testimony under Rule 702 excluded Dr. Davidson's testimony.  Exh. 39, 45; *Rose,* 2009

3    WL 902311; *O'Hanlon*, 2007 U.S. Dist. LEXIS 65655.

4         Prior to the MDL, the courts also addressed the testimony of several other experts, and in

5    every instance found an inadequate foundation for the admission of similar causation testimony

6    under Rule 702.  *See* Exh. 39, 42-44; *Evans v. Matrixx Initiatives, Inc.,* 2009 U.S. Dist. LEXIS

7    88224 (M.D. Fla. Feb. 18, 2009) (excluding testimony of Robert M. Loper, M.D. and Octavio J.

8    Carreno, M.D.); *Lusch*, 2007 U.S. Dist. LEXIS 72068 (excluding testimony of Miriam R.

9    Linschoten, Ph.D., Edsel U. Kim, M.D. and Allen M. Seiden, M.D.); *Wyatt*, 2007 U.S. Dist.

10   LEXIS 67986 (excluding testimony of Guy H. Handley, M.D., Roger D. Lander, Pharm. D.);

11   *O'Hanlon*, 2007 U.S. Dist. LEXIS 65655 (excluding testimony of Gerhard N. Schrauzer, Ph.D.).

12   **F.    The MDL General Causation Daubert Motions**

13        The MDL court's case management schedule provided for the designation and deposition

14   of common issue experts, including experts on general causation, and the filing and adjudication

15   of general causation Daubert motions.  The MDL Plaintiffs designated Steven Pike M.D., Ashim

16   Mitra, and Greg Eldon Davis M.D. as their causation experts.  All three addressed the

17   distribution/target organ exposure issue in their expert reports.

18        All three testified that Zicam gel can be sprayed up to the olfactory cleft, based on the

19   available scientific evidence.  Dr. Mitra also opined that sniffing also draws gel up to the

20   olfactory cleft.  The District Court found these opinions lacking in any reasonable and reliable

21   scientific basis, and excluded them under Rule 702.  *In re Zicam Cold Remedy Marketing, Sales*

22   *Practices, and Prods. Liab. Litig.,* 2011 WL 798898, *8, *14, *16 (D. Ariz. Feb. 24, 2011).

23   ───────────────────

24        [6] Most significantly, whereas Dr. Jafek assumed (without any scientific proof) that nasal
     anatomy allowed direct access to the olfactory cleft for deposition of sprayed nasal gel, Dr.
25   Davidson recognized that nasal anatomy ordinarily blocks such direct delivery.  But Dr. Davidson
     instead assumed (without scientific proof) that users invariably "sniffed" the gel up to the
26   olfactory cleft.  Both assumptions have been found lacking in scientific basis.  *See, e.g.*, Exh. 37-
     38, 43, 45; *Rose v. Matrixx Initiatives, Inc.,* 2009 WL 902311,*1, *5 n.4, *10-11 (W.D. Tenn.
27   Mar. 31, 2009); *Benkwith*, 467 F. Supp. 2d at 1323-1325; *Lusch*, 2007 U.S. Dist. LEXIS 72068,
     *9-10; *Sutherland*, 2006 U.S. Dist. LEXIS 96652, at *19-22.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS         - 8 -         CASE NO. CV 09 2904 WHA
SF01/ 841794.1

Dr. Pike additionally testified that zinc ions can be released from the gel and can reach the olfactory cleft by a process of electro-osmotic diffusion.  He relied on a single study which suggested that zinc ions from a zinc gluconate lozenge could travel from the mouth to the nasopharynx and reach the lower nasal cavity under experimental conditions which included artificially inducing a substantial electrical gradient between the mouth and the nose.  He then theorized that an electrical gradient between the lower nasal cavity and the olfactory cleft could transport zinc ions through a similar mechanism.  Though he did no testing, or even calculations, to support the theory or demonstrate that a toxicologically significant dose of zinc ions would reach the olfactory cleft, and though there is no evidence that a similar electrical gradient can be found between the lower nasal cavity and the olfactory cleft, the District Court overruled Defendants' Rule 702 objections to this testimony.  *Id.* at *17.

Dr. Mitra additionally testified that garden variety diffusion could transport zinc ions to the olfactory cleft.  He too cited no testing or calculations to demonstrate any, or any toxicologically significant delivery to the olfactory cleft, but the District Court nevertheless overruled Defendants' Rule 702 objections to this testimony.  *Id.* at *13-14.

**G.      Withdrawal of the Product in June 2009**

In June 2009, the FDA issued a Warning Letter to Matrixx.  The FDA alleged that Zicam no longer qualified for the discretionary safe harbor exemption for homeopathic drugs under the Compliance Policy Guide due to the questions raised over its safety and efficacy, effectively requiring Matrixx to submit and obtain approval of a New Drug Application (NDA) in order to continue marketing the intranasal cold remedy products, i.e., the nasal spray and swabs.  Exh. 86 (FDA Warning Letter dated June 16, 2009) (Warning Letter).  Matrixx responded by voluntarily withdrawing the products pending potential preparation and submission of an NDA, but objected and alerted the FDA to the studies done by the company and the opinions of the several district courts exposing the foundational flaws in the scientific evidence.  Exh. 87 (Matrixx's Response to FDA Warning Letter dated Nov. 16, 2009).  The FDA responded in March 2010 with an analysis purporting to justify its position, specifically (and repeatedly) observing that unlike courts, juries, and scientific researchers it did not need to reach, and had not reached, a conclusion that Zicam in

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                      - 9 -                    CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1   fact causes smell loss – only that there was a sufficient well-founded suspicion of an association

2   (a "safety signal") to justify requiring an NDA.  Exh. 88 (FDA Reply to Matrixx's Response to

3   Warning Letter dated Mar. 4, 2010).

4       The District Court sustained Defendants' objections to the Plaintiffs' causation experts'

5   reliance on the FDA action and analysis, holding that an expert could not reasonably rely on the

6   conclusions of the FDA because the FDA applied different, more lenient standards and did not

7   reach a scientific conclusion, and the FDA's analysis based on customer complaints in its

8   database was unreliable and fundamentally tainted by publicity bias.  *In re Zicam*, 2011 WL

9   798898 at *11.

10  **H.      Specific Causation Testimony**

11      On remand, Plaintiff designated Dr. Davis as his sole retained specific causation expert.

12  Dr. Davis did not examine Mr. Nelson, but relied on the examination of his treating physician, Dr.

13  Stone, and the report of Dr. Hwang, a non-retained physician Mr. Nelson saw for purposes of

14  litigation. Exh. 49 (Davis Depo.-Nelson) at 67:10-18, 68:6-18. (A separate motion seeks the

15  exclusion of Dr. Hwang's causation testimony.)

16      **1.      Plaintiff's Medical History**

17      Plaintiff testified he used Zicam in late December 2008 because he felt the initial

18  symptoms of a cold.  He had used the Zicam swabs in 2006 to treat a cold, and this time he used

19  the spray product.  Exh. 5 (Nelson Depo.) at 144:20-24, 171:5-23.  He testified that he applied the

20  product essentially according to the package directions, but then sniffed up the gel, contrary to the

21  instructions, and felt a strong burning sensation that lasted 5-15 minutes.  *Id.* at 164:15, 166:12,

22  170:10-12.  He quickly blew his nose several times to expel the gel from his nose.  Based on this

23  experience, he decided not to use the product again. *Id.* at 166:19-168:8, 169:3-10, 171:2-4.

24      Plaintiff did not note any change in his smell function after using Zicam.  Within the next

25  few days, however, Plaintiff developed a cold, which lasted about ten days.  During the cold he

26  developed congestion and, as is typical for him during a cold, his sense of smell became inhibited.

27  *Id.* at 101:8-15, 102:3-6, 171:2-4, 172:5-173:13.  A few days after the cold went away, Plaintiff

28  noticed that his smell function had not returned; in fact, it was gone.  *Id.* at 175:1-4, 18-176:5,

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                    - 10 -               CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1   211:7-19.  This was approximately two weeks after his Zicam use, but only a few days after the

2   end of his cold.  Exh. 49 (Davis Depo.-Nelson) at 21:21-22:1, 24:12-25:9, 27:3-10.

3        Plaintiff testified he decided to file suit when he became aware of the FDA Warning

4   Letter in June 2009.  Exh. 5 (Nelson Depo.) at 26:23-27:1.

5        **2.      Initial Medical Treatment**

6        Plaintiff first sought medical treatment for his smell loss on February 23, 2009, when he

7   saw ENT Dr. David Stone.  Exh. 5 (Nelson Depo.) at 128:13-21, 187:22-24.  This was four

8   months before Plaintiff decided to pursue a claim that Zicam caused his smell loss.  *Id.* at 26:23-

9   27:1, 15-18.  Dr. Stone's chart note is the sole document recording the history of Plaintiff's smell

10  loss before he decided to file suit.

11       According to Dr. Stone's chart and testimony, there was no discussion of Zicam use and

12  no mention of any burning sensation when Mr. Nelson presented to him.  Exh. 70 (Stone Depo.)

13  at  29:14-30:215 and Depo. Exh. 3; Exh. 49 (Davis Depo.-Nelson) at 110:25-111:11.[7]  Dr. Stone

14  advised Plaintiff that the cold was the most common cause of smell loss, but did not offer, and

15  does not have, any opinion as to the cause of his smell loss.  Exh. 70 (Stone Depo.) at 42:5-43:4;

16  Exh. 5 (Nelson Depo.) at 192:7-193:1-4.  The history recorded by Dr. Stone indicated that in

17  response to questions from Dr. Stone, Plaintiff advised the smell loss began "*gradually four*

18  *months ago*" – October 2008, two months or more *before* he used Zicam.  Exh. 70 (Stone Depo.)

19  at 25:1-20, 26:15-27:1, 30:21-31:4 and Depo. Exh. 3 (emphasis added).

20       Plaintiff claims that Dr. Stone mistakenly recorded "months" instead of "weeks" in his

21  chart, which would place the smell loss in late January 2009.  Exh. 5 (Nelson Depo.) at 176:16-

22  21.  Dr. Stone testified to a reliable and accurate history documentation practice: he records the

23  history in real time on a hand-held computer, and has done so for many years, although he

24

25       [7] In contrast, Plaintiff testified he told Dr. Stone that he had lost his sense of smell after
    taking Zicam in December and experiencing a burning sensation, and asked about a possible link,
26  but Stone said he was unaware of any connection between Zicam and smell loss.  Exh. 5 (Nelson
    Depo.) at 128:22-129:5, 131:7-14, 19-22, 134:25-135:1.  Dr. Stone testified that such a
27  conversation would have been noted in the chart.  Exh. 70 (Stone Depo.) at 29:14-30:15.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS            - 11 -                CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1   acknowledged it was "possible" or "conceivable" that he made a mistake.  Exh. 70 (Stone Depo.)

2   at 17:11-19.  But Dr. Stone noted that he takes the history directly, he would have had to hit the

3   wrong button twice to make that mistake, and he separately recorded the same information on a

4   radiology requisition form.  *Id.* at 48:19-49:23, 62:24-63:1.  Moreover, Plaintiff offered no

5   explanation for why the chart would record the loss as a "gradual" one if Plaintiff did not supply

6   that information.  Indeed, Plaintiff testified he told Stone his smell loss was "abrupt."  Exh. 5

7   (Nelson Depo.) at 129:6-11.

8       In September 2009, after Plaintiff had filed suit, he went to Dr. Stone seeking to have his

9   smell function tested for litigation, and to ask whether Dr. Stone would testify for him as an

10  expert.  Dr. Stone testified this was the first time Plaintiff mentioned his Zicam use.  Dr. Stone

11  declined to attribute the loss to Zicam use, though he wrote that it was "possible" based on the

12  revised history provided by Plaintiff and the FDA and media reports linking Zicam to smell loss.

13  Dr. Stone also declined to administer a smell test, because he does not do so in his practice.  *Id.* at

14  130:14-21, 131:23-25; (Stone Depo.) at 37:6-23, 38:17-25, 40:8-20, Depo. Exh. 4.  At deposition,

15  Dr. Stone expressed no opinion on the cause of Plaintiff's smell loss.  *Id.* at 42:19-43:4.

16      **3.      Post-Suit Medical Consultation**

17      In September 2010, Plaintiff purchased and self-administered a smell function test and

18  graded it himself.  Exh. 5 (Nelson Depo.) at 136:21-137:3, 138:15-23.  He later reached out to Dr.

19  Davis, who agreed to testify as an expert on specific causation, but declined to examine him.  Dr.

20  Davis did agree to score another self-administered smell test, and scored Plaintiff as anosmic.  *Id.*

21  at 134:3-23; Exh. 49 (Davis Depo.-Nelson) at 10:15-20.

22      In January 2012, Dr. Davis referred Plaintiff to a former colleague, Dr. Peter Hwang at

23  Stanford, for an examination for litigation.  Exh. 49 (Davis Depo.-Nelson) at 68:6-18.  Based

24  largely on a typewritten History and Background Facts Plaintiff had prepared for litigation and

25  previously provided to Dr. Davis, Dr. Hwang opined that Plaintiff's smell loss was most likely

26  caused by Zicam use. *Id.* at 132:18-24, 133:3-13, 136:1-5, 202:10-203:2, 209:17-24, 210:17-20.

27      Also in January 2012, Dr. Davis requested that Plaintiff see Dr. Lodewick for allergy

28  testing, to rule out allergic rhinitis.  Exh. 49 (Davis Depo.-Nelson) at 69:16-18.

Drinker Biddle &
Reath LLP
Attorneys At Law
San Francisco

Defendants' Motion to Exclude Certain
Testimony of Dr. Greg Davis
SF01/ 841794.1                      - 12 -                    Case No. CV 09 2904 WHA

### 4.    Dr. Davis' Causation Opinions

Based primarily on the history and information provided by Plaintiff, Dr. Davis' report concluded that Zicam was the most likely cause of Plaintiff's smell loss because it is cytotoxic. The "only other possible source for his olfactory loss" discussed was the cold, which Dr. Davis found "much less likely" than Zicam.  He did not rule out the cold as the cause, but noted that post-viral anosmia is "an uncommon event" and the cold virus did not cause Plaintiff's burning sensation.  The report did not mention Plaintiff's age as a possible cause, nor idiopathic smell loss. Exh. 48 (Davis Rpt.-Nelson) at 4.  At deposition, Dr. Davis confirmed that he considers Zicam the more likely cause (1) because Zicam is cytotoxic to tissue in vitro and at high doses directly applied to the mouse OE, can cause smell dysfunction, and (2), to a lesser extent, because Plaintiff claimed he experienced a burning sensation following Zicam use. Exh. 49 (Davis Depo.-Nelson) at 75:2-76:7.

Dr. Davis "ruled in" Zicam as a potential cause despite the fact that the only pre-litigation documentation available – Dr. Stone's February 2009 chart – demonstrated that Plaintiff's smell loss preceded his Zicam use.  Dr. Davis' report made no mention of the timing issue.  Exh. 48 (Davis Rpt.-Nelson) at 3-4.  At deposition Dr. Davis testified at first that he had no information from any of the history documentation (including Dr. Stone's chart) indicating "that Mr. Nelson experienced smell loss any time earlier than several days after his cold disappeared."  Exh. 49 (Davis Depo– Nelson) at 27:3-10.  When confronted specifically with Dr. Stone's chart, however, he acknowledged that Dr. Stone recorded the smell loss occurring gradually beginning in October 2008.  *Id.* at 27:11-24.  He then testified that Plaintiff had told him that Dr. Stone had testified he may have made a mistake, and though he had the Stone deposition in his file, he had not reviewed it; instead he was assuming, based solely on Plaintiff's say-so, that the chart was incorrect.  *Id.* at 27:25-31:17.  Dr. Davis went on to testify that even when the history is provided for litigation and he is relying on it as a critical basis for his opinion, his practice is to take the patient or Plaintiff's history at "face value."  *Id.* at 70:11-73:6.[8]

---

[8] In addition to deviating from reliable scientific methods, Dr. Davis deviated from his

(Continued)

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1                    - 13 -                    CASE NO. CV 09 2904 WHA

1       Dr. Davis also ruled in Zicam as a potential cause even though

2           • The published scientific literature does not support a conclusion that the Zicam

3                gel can reach the olfactory cleft (*Id.* at 98:2-99:11, 100:8-11);

4           • His opinion that Zicam damaged plaintiff's OE and caused smell dysfunction is

5                based on his theory that it destroyed OE located on the middle turbinate or

6                otherwise remote from the olfactory cleft (*Id.* at 81:15-82:23, 99:12-19, 121:8-

7                15, 132:22-25);

8           • He acknowledges that the OE is ordinarily and primarily located in the olfactory

9                cleft, but opines that there is *some* undetermined amount in small isolated

10              patches located on the middle turbinate in *some undetermined percentage*

11              *individuals* (*Id.* at 81:15-82:13, 84:20-85:17, 86:3-23; Exh. 47 (Davis Depo.-

12              MDL) at 148:11-149:21, 150:16-153:12, 155:24-157:23, 166:17-167:1, 170:3-

13              23; *See also* Exh. 76 (Scheibe 2008) at 643);

14           • He has no evidence that Plaintiff has *any* OE located outside the olfactory cleft,

15                much less how much, or where (*Id.* at 79:13-80:25, 86:24-87:3);

16           • He is not aware of any evidence that any OE located outside the olfactory cleft is

17                functional (Exh. 47 (Davis Depo.-MDL) at 153:13-154:19;

18           • He does not know how much of an individual's OE needs to be destroyed before

19                there is anosmia, or permanent anosmia, or even detectable smell loss (*Id.* at

20              149:22-150:12, 170:25-171:14; Exh. 49 (Davis Depo.-Nelson) at 108:17-24,

21              119:25-120:11);

22           • He does not know how much Zicam gel must reach the OE in order to cause

23              smell loss, complete smell loss, or complete and permanent smell loss (*Id.* at

---

(Continued)

own methodology in assuming the history in favor of Plaintiff. He testified "I take people at their face value *until I have reason to think otherwise.*" *Id.* at 70:16-18 (emphasis added). *See also id.* at 71:18-21 ("I would say for the majority of the time – vast majority of the time, *unless I have reason to believe otherwise*, that I take the patient's report as face value.") (emphasis added).

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS     - 14 -     CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1    107:12-108:16).

2         Under the circumstances, his initial decision to rule in Zicam as a potential cause of

3    Plaintiff's smell loss is inherently speculative.

4         Even assuming Zicam use were properly considered a potential cause of Plaintiff's smell

5    loss, Dr. Davis' selection of Zicam as *the* cause lacks a reliable scientific basis.  He cannot rule

6    out the cold, he acknowledges it is one of the leading causes of persistent smell loss, and

7    plaintiff's presentation of losing smell function during the course of a cold and then noticing that

8    function never returned after the cold cleared is classic presentation of post-viral anosmia.  *Id.* at

9    34:7-35:4, 50:14-16.  Exh. 47 (Davis Depo.-MDL) at 80:21-82:6.  *See also* Exh. 70 (Stone Depo.)

10   at 50:9-21 (describing the same scenario as what he "usually sees" with post-viral smell loss).  He

11   also acknowledges that the temporal relationship between the cold and his smell loss is closer

12   than the relationship between his Zicam use and smell loss.  Exh. 49 (Davis Depo.-Nelson) at

13   24:17-25:14.  *See also* Exh. 47 (Davis Depo.-MDL) at 214:20-215:11 (generally, where smell

14   loss occurs after Zicam use, there is a temporal relationship with both Zicam and the cold).

15        Nor can he rule out age as a cause.  Exh. 49 (Davis Depo.-Nelson) at 50:7-19.  Age is a

16   long-established, generally accepted cause of smell loss.  *Id.* at 48:23-49:7, 49:8-50, 115:15-21.

17                                          **II.**

18                                      **DISCUSSION**

19   **A.    Statement of the Law**

20        Rule 702 and *Daubert* require District Courts to police the foundations of expert causation

21   opinions, principally so that juries are not burdened with junk science in sorting out complex

22   scientific issues.  "Expert evidence can be both powerful and quite misleading because of the

23   difficulty in evaluating it."  *Daubert v. Merrill Dow Pharms.*, 509 U.S. 579, 595 (1993) (citations

24   omitted) ("*Daubert*").  Rule 702 provides:

25            If scientific, technical, or other specialized knowledge will assist
26            the trier of fact to understand the evidence or to determine a fact in
             issue, a witness qualified as an expert by knowledge, skill,
27            experience, training, or education, may testify thereto in the form of
             an opinion or otherwise, if (1) the testimony is based upon

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS          - 15 -          CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1  sufficient facts or data, (2) the testimony is the product of reliable
   principles and methods, and (3) the witness has applied the
2  principles and methods reliably to the facts of the case.

3       Courts must ensure that "any and all scientific testimony is not only relevant, but

4  reliable." *Daubert*, 509 U.S. at 589.  The expert's opinion must be "scientific knowledge," *id*. at

5  590, i.e., have a reliable basis in the data, reasoning, and methodology; opinions based on

6  "unsubstantiated generalizations, speculative hypotheses and subjective evaluation" or "not 'derived

7  by the scientific method'" must be excluded.  *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1316

8  (9th Cir. 1995) ("*Daubert II*"); *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 184 (E.D.N.Y.

9  2001).  "'Scientific' implies a grounding in the methods and procedures of science," and

10 "'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S.

11 at 590; *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).  Untested, unproven

12 theories or hypotheses are inadmissible speculation.  *Daubert*, 509 U.S. at 592; *Kumho Tire Co. v.

13 Carmichael*, 526 U.S. 137, 156 (1999).  The goal of Rule 702 is to ensure that the expert has applied

14 the same standards of scientific and intellectual rigor to his testimony in court as experts apply to their

15 work in the field.  *Kumho*, 526 U.S. at 152;  *Cooper v. Brown*, 510 F.3d 870, 943 (9th Cir. 2007).

16      *Daubert* identified five non-exhaustive factors that may be considered in evaluating

17 whether scientific evidence is sufficiently reliable: (1) whether the theory or technique has been

18 or could be tested; (2) whether it has been subjected to peer review and publication; (3) whether

19 scientific standards and controls exist to govern the theory or technique's application or

20 operation, (4) the known or potential error rate from the expert's technique; and (5) whether the

21 technique or theory has been generally accepted in the scientific community.  *Daubert*, 509 U.S. at

22 593-595.  Additional factors include whether the expert relies on anecdotal evidence, such as case

23 reports, on temporal proximity, and on improper extrapolations from data such as animal studies;

24 whether the expert is proposing to testify about matters growing directly out of independent research

25 or whether the opinion was primarily developed for purposes of testifying; whether the expert has

26 unjustifiably extrapolated from an accepted premise to an unfounded conclusion; whether the expert

27 has adequately accounted for obvious alternative explanations; whether the expert is being as careful

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS          - 16 -          CASE NO. CV 09 2904 WHA
SF01/ 841794.1

as he would be in his regular work; and whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion proffered. *See* Advisory Committee Notes to FRE 702; *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312, 1314, 1321 (11th Cir. 1999); *Cagle v. Cooper Indus., Inc.*, 318 F.Supp.2d 879, 890 (C.D. Cal. 2004).

The common thread:  all these factors are designed to explore the expert's adherence to the scientific method.  While the focus is on the principles and methods employed by the expert, rather than the conclusions they generate, conclusions and methodology are not entirely separable.  Under Rule 702, the court should exclude opinions connected to existing data only by the *ipse dixit* of the expert, or where "there is simply too great an analytical gap between the data and the opinion proffered."  *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The determination of whether the opinion is undermined by an analytical gap applies not only to evaluating the reliability of the testimony, but also the second inquiry mandated by *Daubert* and Rule 702, whether the testimony properly "fits" the data and the issue presented. Opinion testimony does not "fit" and is not helpful to the trier of fact when it lacks a valid scientific connection to the matter at hand.  *Daubert*, 509 U.S. at 591-592.

**B.** **Dr. Davis' Causation Opinion Is Speculative And Lacks Reliable Basis And Fit Due To The Existence Of Analytical Gaps**

Sizeable analytical gaps between the opinion and the supporting data undermine reliability, eliminate fit, and make the opinions excessively speculative.  Dr. Davis' opinion that Plaintiff's smell loss was caused by his Zicam use has several analytical gaps intolerable under Rule 702.

Dr. Davis acknowledges that there is no reliable scientific basis to support a conclusion that Plaintiff's use of Zicam resulted in delivery of gel to, and damage to, the OE located in the olfactory cleft, where most smell tissue is located.  Consequently, his causation opinion devolves to the theory that Zicam use produces permanent anosmia by destroying smell tissue located in lower, and thus more accessible, areas of the nasal cavity.

But there is no evidence that destruction of any smell tissue outside of Plaintiff's olfactory cleft could have produced his smell loss.

DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                - 17 -                CASE NO. CV 09 2904 WHA
SF01/ 841794.1

- There is no evidence that Plaintiff has any smell tissue located outside the olfactory cleft.  Exh. 49 (Davis Depo.-Nelson) at 79:13-80:25, 86:24-87:3.

- Even if one could assume Plaintiff has some smell tissue located outside the olfactory cleft, there is no evidence of how much, or where such tissue is located (*Id.*).

- Even at the population level, there would be no basis to conclude that destruction of non-olfactory cleft smell tissue could cause smell loss.  Dr. Davis testified he has no idea how much of the smell tissue needs to be compromised generally in order to cause severe and permanent smell loss.  Exh. 47 (Davis Depo–MDL) at 149:22-150:12, 170:25-171:4; Exh. 49 (Davis Depo.-Nelson) at 96:8-24, 108:17-24, 119:25-120:11.  Defense expert James Schwob, however, does know – at least a majority of the smell tissue must be severely damaged in order to cause any significant smell deficit, and only a small portion of the smell tissue, at most, resides outside of the olfactory cleft, there is no basis to conclude that smell loss can result from destruction of non-olfactory cleft smell tissue.  Exh. 52 (Schwob Rpt.) at 12, 18.

- Dr. Davis also lacks knowledge of how much Zicam is needed to cause enough destruction of the smell tissue to produce smell loss.  Exh. 49 (Davis Depo.-Nelson) at 107:12-108:16.

The consequence of these analytical gaps is that Dr. Davis' opinion that Zicam could have been – much less, was – the cause of Plaintiff's smell loss is speculative and insufficient.  *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005); *Allen v. Pennsylvania Engineering Co.*, 102 F.3d 194, 198-99 (5th Cir. 1996); *Wright v. Willamette Indus. Inc.*, 91 F.3d 1105,1106 (8th Cir. 1996) (evidence of level of exposure needed to cause the injury and that Plaintiff's exposure in fact reached this level is necessary to a conclusion of causation); *Abuan v. General Elec. Co*, 3 F.3d 329, 333-334 (9th Cir. 1993) ("In cases claiming personal injuries from exposure to toxic substances, it is essential that the plaintiff demonstrate that she was, in fact, *exposed to harmful levels* of such substances.").  Dr. Davis lacks evidence of the threshold of

DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1                                - 18 -                    CASE NO. CV 09 2904 WHA

1   Zicam exposure or OE destruction needed to cause smell loss, and he lacks evidence that

2   Plaintiff's use would have produced this level of Zicam (or zinc) exposure to the smell tissue, or

3   that this much of Plaintiff's smell tissue was compromised.

4       Similarly, courts have recognized that the inability to reliably "rule in" an exposure as a

5   potential cause precludes a reliable specific causation opinion.  *See Clausen v. M/V New Carissa*,

6   339 F.3d 1049, 1058 (9th Cir. 2003) (causation testimony that rules in a cause that is not actually

7   capable of causing the harm may be unreliable and inadmissible); *Ruggiero v. Warner-Lambert*,

8   424 F.3d 249, 254 (2d Cir. 2005) (a potential cause must be ruled in using scientifically valid

9   methodology); *McClain*, 401 F.3d at 1242 (failure to consider threshold dose and whether it was

10  exceeded is a failure to follow valid scientific methodology for evaluating causation).  *See also id.*

11  at 1241-42 ("When analyzing an expert's methodology in toxic tort cases, the court should pay

12  careful attention to the expert's testimony about the dose-response relationship.… The expert who

13  avoids or neglects this principle of toxic torts without justification casts suspicion on the

14  reliability of his methodology.").  Absent some reasonable evidence of the dose needed to reach

15  the OE to cause the harm and some reasonable evidence that this dose or more did so when the

16  Plaintiff used the product, Dr. Davis' opinion that Plaintiff's complete and permanent smell loss

17  was caused by an excessive dose of Zicam is simply subjective speculation and/or a circular,

18  result-oriented exercise in justification.  For this reason, "[s]cientific knowledge of the harmful

19  level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are

20  minimal facts necessary to sustain the plaintiff's burden."  *Allen*, 102 F.3d at 199.  Lack of

21  reliable data to support these threshold "minimal facts" exposes an excessive analytical gap and a

22  deviation from reliable scientific methodology.  *Bland v. Verizon*, 538 F.3d 893, 898 (8th Cir.

23  2008); *McClain*, 401 F.3d at 1241-42.

24      Dr. Davis entirely avoids the question of dose.  He relies in large part on in vitro and high

25  dose animal evidence, that Zicam applied to explanted tissue in a petri dish can cause

26  cytotoxicity, and that very high doses of Zicam applied directly to the OE in animals can damage

27  smell tissue and produce dysfunction.  But the question is not whether Zicam at some high dose

28  applied directly to the OE can cause damage or permanent anosmia, but whether Plaintiff's use

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1                    - 19 -                    CASE NO. CV 09 2904 WHA

1    would have resulted in his real world target organ toxic exposure to Zicam, capable of producing

2    permanent anosmia.

3         Nor can the missing dose-response foundation for Dr. Davis' opinion be supplied by other

4    experts.  First, Dr. Davis disclaims any reliance on other experts.  Exh. 49 (Davis Depo.-Nelson)

5    at 63:3-64:15, 65:6-9, 19-23.  Second, Dr. Davis essentially confirmed that the Pike and Mitra

6    diffusion opinions were unscientific, by acknowledging that their reliance on diffusion theories is

7    the beginning of the analysis, not the end.  To reach a scientific conclusion that diffusion

8    transports a significant amount of zinc ions to the olfactory cleft would require calculations,

9    modeling or experimentation – none of which experts Pike and Mitra performed. *Id.* at 159:25-

10   161:21.

11        In sum, given the significant and substantial gaps in the chain of reasoning between the

12   data available and the conclusion drawn, Dr. Davis' causation opinion lacks a reliable foundation,

13   lacks fit, and amounts to nothing more than speculation.  *See In re Paoli Railroad Yard PCB*

14   *Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (any step in the chain of reasoning that renders the expert's

15   analysis unreliable renders the testimony inadmissible).

16   **C.**    **Dr. Davis' Causation Opinion Is Based On A Speculative And Unreliable Differential**
             **Etiology**

17        Even if Dr. Davis had reliably ruled in Zicam as a potential cause of Plaintiff's smell loss,

18   his opinion would be inadmissible because his selection of Zicam over the cold and Plaintiff's

19   age, under the circumstances, lacks a reasonable and reliable basis. Dr. Davis has failed to rule

20   out age and the cold, two long-standing and generally accepted causes of persistent or permanent

21   anosmia.  Exh. 49 (Davis Depo.-Nelson) at 115:15-116:5.

22        At the outset, the use of "differential diagnosis" to evaluate causation is a square peg in a

23   round hole.  "Differential diagnosis is 'the determination of which two or more diseases with

24   similar symptoms is the one from which the patient is suffering by a systematic comparison and

25   contrasting of clinical findings."  *Clausen*, 339 F.3d at 1057 (quoting Stedman's Medical

26   Dictionary 474 (26th ed. 1995)).  In the clinical context, the physician is considering the range of

27   possible diseases in trying to diagnose the patient's disease to facilitate treatment; in the litigation

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1                    - 20 -                    CASE NO. CV 09 2904 WHA

context, the witness is trying to assess ultimate cause or etiology to determine fault, an inquiry which may have little consequence outside the lawsuit. For these reasons, courts have noted that a more apt description of the process is "differential etiology." *See McClain*, 401 F.3d at 1252.

Here, Dr. Davis is not trying to diagnose the disease Plaintiff has to render medical treatment – he has anosmia, that was established long before the litigation was initiated, and whether it resulted from age, virus, Zicam, or idiopathic causes has no significance for future treatment, and Dr. Davis is not intending to treat Plaintiff. Rather, Dr. Davis has been retained entirely for purposes of litigation, to assist Plaintiff by fixing blame for the anosmia on Zicam use. Exh. 49 (Davis Depo.-Nelson) at 57:15-21, 58:9-23, 60:4-12, 69:11-15.

Consequently, this is a litigation-driven rather than a research- or medical-driven opinion, and should be assessed as such for purposes of Rule 702. Opinions developed pursuant to litigation assignments, expressly for the purpose of testifying, rather than through independent research, are properly subject to additional judicial scrutiny for reliability. In evaluating reliability under Rule 702, "one very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317. Dr. Davis' specific causation opinion is entirely a creature of litigation.

In determining the specific cause among the various potential causes, the expert must use scientifically valid methods and procedures to rule out each significant possible cause. *Clausen*, 339 F.3d at 1058; *In re Paoli*, 35 F.3d at 760. Elimination of a potential cause must be based on valid scientific methodology and more than the expert's subjective belief or speculation. *See In re Viagra Prods. Liab. Litig.*, 658 F.Supp.2d 950, 959 (D.Minn. 2009).

Dr. Davis admits that *he has not ruled out Plaintiff's cold, Plaintiff's age, or idiopathic causes, as the cause of Plaintiff's smell loss*. Exh. 49 (Davis Depo.-Nelson) at 50:7-19. He also acknowledges that there is no laboratory finding or observation on examination which rules out the cold or age or signifies Zicam as the cause. *Id.* at 113:19-115:14. Rather, Dr. Davis simply chooses Zicam as a more likely cause than the others. But his failure to reasonably rule out these

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS
SF01/ 841794.1                                    - 21 -                    CASE NO. CV 09 2904 WHA

1    well-established causes renders his opinion inherently unreliable and speculative.  *See In re*

2    *Viagra*, 658 F.Supp.2d at 950; *E. I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 559

3    (Tex. 1995).

4         Moreover, Dr. Davis' choice among causes is not reliably supported by the evidence and

5    the product of a reasonably reliable application of valid scientific methodology.  He relies entirely

6    on the history given by Plaintiff, but (1) nothing about that history supports blaming Zicam use

7    over the other, long-established and well-established causes of permanent anosmia, and (2) Dr.

8    Davis improperly ignores the significant reliability issues surrounding the history provided by

9    Plaintiff.  Consequently, Dr. Davis lacks a reasonable basis for choosing the conclusion desired

10   by Plaintiff over the others suggested by the evidence, and his opinion therefore never rises above

11   the level of unsupported speculation.

12        First, Dr. Davis ignores the temporal relationship between the cold and Plaintiff's smell

13   loss, and ignores the comparative temporal gap between the Zicam use and smell loss.  It is

14   undisputed that Nelson developed his smell loss *during* the course of a cold after developing nasal

15   congestion, but several days *after* using Zicam.  There is no evidence that Plaintiff experienced

16   smell loss between the time he used Zicam and the time he developed congestion during the

17   course of his cold and then began experiencing an inhibition of his smell function.  And it is

18   undisputed that Plaintiff first noted his anosmia several days after the cold symptoms

19   disappeared, but about two weeks after his use of Zicam.  Dr. Davis acknowledges that the "time

20   course" of the onset of the disease is very important to his opinion; acknowledges that there is a

21   closer temporal relationship between the smell loss and the cold than the smell loss and Zicam

22   use; and describes the time course of Plaintiff's cold and manifestation of his smell loss as a

23   classic presentation of post-viral anosmia. Exh. 49 (Davis Depo.-Nelson) at 20:1-8, 28:11-15,

24   30:9-31:17, 72:13-73:6.  And he cites no evidence that Zicam use can result in smell loss

25   occurring days to weeks later.  In sum, the cold is a perfect temporal fit to explain Plaintiff's

26   smell loss, Zicam use is not.

27        In addition to the fact that temporal relationship does not support an opinion that Zicam

28   rather than the cold is the cause here, Dr. Davis's misguided attempt to rely heavily on temporal

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS          - 22 -          CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1    relationship is also not a valid and reliable scientific methodology to reach causation conclusions.

2    *See McClain*, 401 F.3d at 1243 ("[S]imply because a person takes drugs and then suffers an injury

3    does not show causation.  Drawing such a conclusion from temporal relationships leads to the

4    blunder of the *post hoc ergo propter hoc* fallacy.").

5         Though one would not expect a specific causation analysis to be peer-reviewed and

6    published, in its absence "the experts must explain precisely how they went about reaching their

7    conclusions and point to some objective source – a learned treatise, the policy statement of a

8    professional association, a published article in a reputable scientific journal or the like – to show

9    that they have followed the scientific evidence method, as it is practiced by (at least) a recognized

10   minority of scientists in their field."  *Daubert II*, 43 F.3d at 1319.  Dr. Davis never explains why

11   the cold is not the likely cause, and he has cited to no scientific evidence or literature whatsoever

12   which suggests that the cold is not a likely explanation for Plaintiff's smell loss.  Indeed, Dr.

13   Davis acknowledges that if Zicam use were taken out of the scenario, he would attribute

14   Plaintiff's condition to the cold.  Exh. 49 (Davis Depo.-Nelson) at 36:11-25.  Again, the record is

15   clear that even Nelson's self-serving post-litigation history is the classic presentation of post-viral

16   anosmia, and his age puts him squarely within the population of those at risk for age-related smell

17   loss.  *Id.* at 34:7-35:4, 48:17-50:2.

18        Dr. Davis cites only two reasons for favoring Zicam as the ultimate cause, and neither of

19   them stand up to gatekeeping scrutiny.  First, he explains that Zicam is cytotoxic.  As discussed

20   above, however, this ignores the threshold questions of target organ exposure and dose-response.

21   There are no similar threshold issues as to the cold virus and aging.  Both the cold virus and the

22   aging process are long-established and generally accepted causes of permanent anosmia, while

23   Zicam's ability to cause smell loss is, at minimum, controversial.  An expert cannot bootstrap his

24   opinion that the substance can cause the harm into an opinion that it did cause the harm; he must

25   be able to demonstrate a reasonable scientific basis for his specific causation opinion.  But

26   bootstrapping is precisely what Dr. Davis has done here.

27        Second, Dr. Davis cites Nelson's post-litigation description of a burning sensation after

28   his use of Zicam.  But Dr. Davis acknowledges that he would have reached the same conclusion

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                    - 23 -            CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1  without the burning sensation; rather, he merely finds it "supportive." Exh. 49 (Davis Depo.-

2  Nelson) at 37:10-17, 75:8-76:7. In other words, even Dr. Davis does not place great evidentiary

3  weight on the burning sensation.

4      The burning sensation is not deserving of weight – it is not a reasonable scientific basis

5  for favoring Zicam use as the cause. Dr. Davis acknowledges that a burning sensation is not

6  pathognomonic for smell loss from a toxic exposure. *Id.* at 37:18-22, 75:17-24. And indeed,

7  there is no scientific basis to interpret a burning sensation in the nasal cavity, triggered by

8  trigeminal nerve endings located throughout the nasal cavity, as evidence that (1) there is damage

9  sustained to olfactory nerves, much less (2) damage to olfactory nerves sufficient to cause smell

10  loss. *Id.* at 38:1-40: 16.

11      Moreover, there is no evidence that Plaintiff lost smell function in the immediate

12  aftermath of the burning sensation he experienced. On this record he did not experience any

13  impairment at all until he later developed congestion during the cold, and he did not develop, or at

14  least manifest, his anosmia until about two weeks later when his cold cleared and his smell

15  function was off. The burning sensation does not provide a reasonable and reliable basis for Dr.

16  Davis's opinion.

17      The failure to rule out leading alternative causes for objectively valid and meaningful

18  reasons is fatal to a specific causation opinion. *Clausen*, 339 F.3d at 1058; *In re Paoli*, 35 F.3d at

19  760; *In re Viagra*, 658 F.Supp.2d at 957-958, 959.

20      Dr. Davis' heavy reliance upon the post-litigation history reported by the interested

21  Plaintiff further undermines the reliability of his opinion. The process of ruling out alternative

22  causes for Plaintiff's injury should be based on objective data and a validated scientific

23  methodology. *In re Paoli*, 35 F.3d at 762. Excessive, blind reliance on the Plaintiff's self-report

24  is an obvious sign of unreliability and a basis for exclusion, *id.*, and Dr. Davis' acceptance of

25  Plaintiff's report at face value qualifies. Though there is an obvious inconsistency between the

26  pre-litigation history recorded by Dr. Stone and the self-serving post-litigation history literally

27  manufactured by Plaintiff, Dr. Davis simply accepted the latter and Plaintiff's explanation that the

28  former was a "mistake." Dr. Davis even went so far as to blindly accept Plaintiff's account and

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS         - 24 -         CASE NO. CV 09 2904 WHA
SF01/ 841794.1

1    interpretation – a mischaracterization – of Dr. Stone's deposition testimony; though he had the

2    transcript in his file, he did not review it, choosing instead to rely entirely on what Plaintiff told

3    him about Dr. Stone's testimony.[9]  This is not a valid and reliable scientific methodology.

4    Indeed, by taking Plaintiff's history at "face value" under these suspicious circumstances, on an

5    issue critical to his opinion, Dr. Davis deviated from his own practice.  Rule 702 requires the

6    opinion be based on sufficient and reliable facts and data, and a valid and reliable methodology

7    applied in a valid and reliable manner.  Dr. Davis' opinion fails on all three predicates.

8                                                  **III.**

9                                          **CONCLUSION**

10           For these reasons, Dr. Davis' causation opinion should be excluded.  He lacks sufficient

11   facts or data to support a conclusion that Plaintiff's permanent anosmia was caused by Zicam use,

12   and his selection of Zicam as the most likely cause has no reliable basis in the facts and data and

13   is not a product of valid and reliable scientific methodology.

14

15   Dated: July 5, 2012                           DRINKER BIDDLE & REATH LLP

16

17                                                 By: /s/ Alan J. Lazarus
                                                       Alan J. Lazarus

18                                                 Attorneys for Defendants
19                                                 MATRIXX INITIATIVES, INC. and ZICAM
                                                   LLC
20

21

22

23

24

25           [9] Dr. Davis' failure to review the deposition transcript before his deposition is particularly
     troubling given that this was the sole opportunity for Defendants to depose Dr. Davis and the rate
26   he charged them for his deposition time was $1000 per hour.  Under the circumstances,
     Defendants had a right to expect that Dr. Davis would be fully and finally prepared to discuss his
27   opinion testimony and its bases at the deposition.

28

DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANTS' MOTION TO EXCLUDE CERTAIN
TESTIMONY OF DR. GREG DAVIS                        - 25 -          CASE NO. CV 09 2904 WHA
SF01/ 841794.1